## Appeal of Kuziak

*Gennaro D. Caliendo*, for appellants.
*Robert E. Yuhnke*, for Commonwealth.

PAUL E. WATERS, Member, September 5, 1974.— This matter comes before the board as an appeal from the grant of a variance by the Department of Environmental Resources (hereinafter "department") to the Pennsylvania Power and Light Company (hereinafter P. P. & L.), intervenor. Appellants are owners of 460 acres of land adjoining the P. P. & L. plant site in Montour County, Pa., and seek to prevent further emissions and dust which settles on their property coming from the use of large volumes of coal in the plant operation. Specifically, the variance was granted to an application filed September 12, 1972, for the period to July 1, 1975, for the burning of coal with a sulfur dioxide content not to exceed 2.5 percent.

## FINDINGS OF FACT

1. Appellants are the owners of 460 acres of farm land in Derry Township, Montour County, adjacent to a steam electric plant owned by P. P. & L.

2. Appellants' farm is located to the southeast of the P. P. & L. steam electric plant, and they have a common border of approximately 5,000 feet.

3. Appellants' property receives blowing coal dirt from the plant's stock pile, stack emissions and, more recently, from large trucks which haul coal to the plant.

4. Appellants lived at this location prior to the operation of the plant by P. P. & L.

5. Another nearby property owner (Mr. Foust) made previous protests regarding the fugitive emissions and blowing coal dust, but his farm was purchased by P. P. & L. and has now become a part of the P. P. & L. property.

6. The P. P. & L. plant produces more electricity than is needed for its own customers, and it sells the excess under a contract arrangement to other electric companies, some of which are in areas which may be more restricted than the Montour Pennsylvania area with regard to air quality and emissions standards.

7. The P. P. & L. plant is the single most significant industrial firm in the area having any effect on air quality.

8. P. P. & L. presently has plans which, if carried out, will substantially increase its electricity production capacity by the 1980's.

9. The Department, responding to complaints by appellants, set up a monitoring station to measure the concentration of sulfur dioxide ($SO_2$) at the residence of appellants.

10. The apparatus used for monitoring was apparently defective or improperly utilized, and it is unlikely that the results have sufficient probative value.

11. On September 12, 1972, P. P. & L. timely submitted to the department a petition for variance pursuant

to chapter 141 of the rules and regulations of the department.

12. The petition requested, among other things, a variance until July 1, 1975, from the sulfur oxides limitations set forth in section 123.22 of Chapter 123 for the bituminous coal-fired steam generating boilers (units 1 and 2) located at P. P. & L.'s Montour Steam Electric Station at Washingtonville, Montour County, Pa.

13. The Montour Steam Electric Station consists of two generating units constructed during the period 1968 to 1973. The units burn bituminous coal and are rated at 750 megawatts each. Unit 1 began commercial operation on March 6, 1972. Unit 2 began commercial operation on April 30, 1973.

14. A variance to July 1, 1975, from section 123.22 of the department's rules was requested to permit P. P. & L. to construct additional coal cleaning facilities at subsidiary and affiliated coal mines to reduce the sulfur content to required levels.

15. On September 12, 1973, a public hearing was held by the department at which time P. P. & L. presented testimony in support of its variance. The hearing was held at Williamsport and was conducted by Mr. Morris Malin, Chief of the Case Section, Division of Abatement and Compliance, Bureau of Air Quality and Noise Control. Appellants were also present at the hearing and testified in opposition to the granting of the petition for variance.

16. In an order issued on March 6, 1974, the department granted P. P. & L.'s petition for variance, finding, among other things, that:

"1. The granting of such a variance will not prevent or interfere with attainment or maintenance of ambient air standards within the time prescribed by the

Federal Clean Air Act and Rules and Regulations promulgated thereunder.

"2. The emissions from the source are likely to comply with Chapter 123 at the expiration of the variance period.

"3. The granting of the variance, as requested, is reasonable inasmuch as the intermediate dates, and the completion date set forth in the petition and incorporated into this order, indicate that the company intends to effect the control of the source as quickly as is reasonably practicable."

17. Since the granting of the variance, P. P. & L. has complied with the terms and conditions contained therein and expects to meet the July 1, 1975, deadline.

18. The plant is presently able to operate within the department regulations only by burning a low sulfur content coal.

19. Coal from various areas has different sulfur content, which can be predetermined and, although the coal which is mined first usually has a low sulfur content, this tends to increase with further extensions into the deposit.

20. P. P. & L. is presently building a plant at a cost of $8.1 million dollars at the coal source (Greenwich mine) which will clean the coal to be burned at two units of the Montour plant, and will keep the coal within prescribed limits.

21. Section 123.22 of the department regulations provides that the sulfur dioxide ($SO_2$) content of coal burned at the plant should not exceed 2.5 percent.

22. The coal being burned by the plant is presently, on a monthly average, below the required levels of $SO_2$, even without the granting of the variance in question.

23. Because the source of coal supply may require the use of coal with a higher $SO_2$ content before the

coal cleaning plant, which must be custom made, is in operation, the variance was requested so that the Montour plant would not be in violation of regulations while awaiting delivery of new and expensive equipment.

24. Appellant offered no qualitative or quantitative testimony of sulfur dioxide emissions or $SO^2$ coal content at the Montour plant.

## CONCLUSIONS OF LAW

1. The board has jurisdiction of the persons and subject matter of this appeal.

2. The department is authorized under chapter 141 to grant temporary variances from sulfur dioxide limitations, subject to rules established by the Environmental Quality Board.

3. Appellants have the burden of proof in an appeal from the grant of a variance under chapter 123, section 123.22 and 123.2 of the department regulations, regarding limitations on sulfur oxides.

4. The appellants have failed to carry their burden and have presented no substantial evidence either to show any actual or potential threat to health by grant of the $SO^2$ variance, or that there has been noncompliance with the temporary variance as granted.

## DISCUSSION

The unpleasant but not uncommon occurrence of feuding neighbors brings this matter before the board for resolution. On another level it is the environmentalists and industry at it again. Those of us who sometimes complain the loudest when the power industry encroaches upon our constitutional rights to a clean environment, are equally as vocal with undeleted expletives when the refrigerator or air conditioner goes off for a few minutes because of a power shortage. It

is a dig only at human nature to state that we do want it both ways.

Appellants have appealed from the grant by the department of a temporary variance to P. P. & L., intervenors in this proceeding. Application was made in September 1973, and the variance (74-953-V) was granted March 6, 1974, after public hearing. The variance is granted to July 1, 1975, and provides primarily that the sulfur dioxide ($SO_2$) content of the coal burned by P. P. & L. at its Montour Plant, may not exceed 2.5 percent.

Appellant has presented very extensive and, indeed, convincing evidence that P. P. & L. has been, is and will continue to sell large amounts of electricity to other power companies in other States. The difficulty with all of this testimony is that P. P. & L. has done nothing which is in violation of any law or regulation to which our attention has been directed by appellants. It is abundantly clear that appellants do not like what is going on practically in their back yard, but the selling of energy is, number one, not regulated by the board and, number two, legal in Pennsylvania.

Appellants next are incensed, and with some justification it appears, because of the excessive amounts of coal dust to which their property is treated two or three times each year. It is unsightly, annoying and requires much extra work in cleaning and repainting. Again, we cannot give relief, only sympathy. This appeal was taken from the grant of a temporary variance from the sulfur oxide limitations of section 123.22 of the departmental regulations. The coal dust problem presumably existed prior to the grant of the variance and, no doubt it will exist after its expiration in July of 1975. There are, of course, fugitive emission standards which the department and P. P. & L. must observe. This appeal did not concern itself with those standards, and appellant is free to take such further

steps as are deemed necessary if such violations exist. We urge the department to cooperate in this effort.[1]

Moving to the final issue and, actually, the only issue properly before us, appellant alleges that the $SO_2$ variance should not have been granted and, we assume in the alternative, noncompliance by P. P. & L. therewith.

Appellant, having filed this appeal, must carry the burden of proving that there is some detriment to himself and/or to the environment in the grant of a temporary variance to P. P. & L. The board freely admits its limited knowledge of the quantitative and qualitative properties and propensity of sulfur oxide. Appellant has offered no enlightenment and, therefore, has failed to carry its burden of proving the department acted arbitrarily, capriciously or without due regard to appellants' well being, which was the very base upon which their case must stand or fall. It falls.

This board was not established to arbitrate private disputes which inevitably arise from property ownership.[2] The board is concerned with damage to the environment which is broad enough in scope to be public in nature. Specifically, the limited temporary variance which is the subject of this appeal does not permit the board to reach the serious and important questions which appellant seeks to litigate.

## ORDER

And now, September 5, 1974, the appeal filed in the above matter is hereby dismissed.

---

[1] It is clearly beyond the scope of this adjudication to resolve the coal dust issue, but it would certainly seem realistic for P. P. & L. to meet with appellant in an effort to make arrangements to restore the property on the occasions when excessive coal dust causes visual damage.

[2] The Courts of Common Pleas of the county where the damage occurs is a proper forum.